UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

WEST PALM BEACH DIVISION

CASE NO.:

BRETT SOKOLOW and
CORI SOKOLOW,

       Plaintiffs,

v.

DOMINIQUE DAMICO, individually
and RAMBLE ON FARM,
an unincorporated entity,

       Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Brett and Cori Sokolow, (collectively, "the Sokolows"), as and for their Complaint and Demand for Jury Trial against Defendants Dominique Damico, individually ("Damico") d/b/a Ramble On Farm ("ROF"), an unincorporated entity, allege and state as follows:

### Allegations Common to All Counts

### Summary of the Action

1.    The underlying matter concerns the Horse "Rockette" (the "Horse"), and misrepresentations and omissions concerning the Horse by Defendants to Plaintiffs, which acts and omissions had an effect upon Plaintiffs in Wellington, Palm Beach County, Florida. The misrepresentations and omissions by Defendants concerned the failure to disclose to Plaintiffs certain latent medical conditions existent in the Horse, in order to induce Plaintiffs to lease the

Horse.   The medical conditions of the Horse ultimately caused actual damages to Plaintiffs in Palm Beach County, Florida. Defendants agreed to accept return of the Horse, and Plaintiffs shipped the Horse from Wellington, Florida to Ocala, Florida, Plaintiffs paying for that transportation.   Despite demand, Defendants have refused to refund the lease fee and reimburse Plaintiffs for their other actual damages.   The within action now follows.

## The Parties

2.      Plaintiffs Brett and Cori Sokolow, husband and wife, who are citizens and residents of Westlake Village, California and are otherwise *sui generis*.

3.      Defendant Dominique Damico is citizen and resident of Pennsylvania, maintaining an address at 2400 Whitehorse Road, Berwyn, Pennsylvania.   At all times relevant hereto and currently, Damico holds herself out to the public as a professional horse trainer, was an owner the Horse "Rockette", and   conducted business regularly and on more than one occasion in Florida with Plaintiffs and with others.

4.      Defendant Ramble On Farm is an unincorporated entity created and used by Defendant Damico, maintaining an address at 2400 Whitehorse Road, Berwyn, Pennsylvania, which at all times relevant hereto and currently, holds itself out to the public as a professional horse trade and training enterprise, that it was an owner of the Horse "Rockette", and which conducted business regularly and on more than one occasion in Florida with Plaintiffs and with others.

## Jurisdiction and Venue

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship of the parties and the amount in controversy is in excess of $75,000.00.   This Court has general personal jurisdiction over Defendants because of their substantial, repeated and not isolated business activities, in the ordinary course of commerce, trade

or use, within this District and Division, which caused harm to Plaintiffs in this District and Division.  This Court has specific personal jurisdiction over Defendants because Defendants committed acts and omissions both without and within this District Division, in the ordinary course of commerce, trade or use, and also by breaching a contract requiring acts to be performed in this District, which caused harm to Plaintiffs in this District and Division.

6.     At times relevant hereto, Defendants Damico and ROF conducted business in Florida with Plaintiffs and with others therein, and otherwise maintained and instructed various agents, employees and representatives to conduct business on Defendants' behalf in Florida.   The conduct of Defendants had an effect upon Plaintiffs in this District, the Horse was used by Plaintiffs in this State and the Defendants failed to perform acts required by the sales transaction to be performed in this State.   Therefore jurisdiction and venue in this District and Division is proper pursuant to F.S. § 48.193(6) and (7) and pursuant to 28 U.S.C. § 1391(b).

**General Allegations**

**The Horse and Defendants**

7.     Rockette is an eleven (11) year old mare, registered with United States Equestrian ("USE") under Registration Number 5360025, which has, since March 2015, amassed an extensive and successful horse show record competing in certain "Hunter" horse show classifications[1] in the United States.

---

[1] The Hunter/Jumper sport is made up of two disciplines: Hunter and Jumper, also known as Show Jumping. Each year more than 1,000 US Equestrian-rated and countless other local Hunter/Jumper competitions take place across the country. Each show offers competition for riders of varying skill levels, and each offers Hunter, Jumper and Equitation classes. While Hunter and Jumper classes judge the horse, Equitation classes judge the rider.
**Hunters**
The origin of the show ring hunter can be found in the sport of fox-hunting where horse and rider galloped over miles of countryside with varying terrain negotiating natural obstacles (fences, hedges, stone walls) encountered along the way while in the pursuit of the game. Modern hunter classes were designed to test the qualities and attributes of a successful hunt horse. These classes are subjectively judged based on the horse's performance over fences as well as its quality of movement under saddle on the flat. Show hunters should possess good style over the jumps, consistent

**Rockette**



8.      According to USE records, when "Rockette" first competed in the United States, she was owned by an entity called Redfield Farm. Ramble On Farm purchased the Horse in April, 2015 from Redfield Farm, and the Horse has been shown primarily by Damico and by Damico's long-time client Kaitlyn ("Katie") Williams, since purchase.

---

pace throughout the course, as well as quiet manners. Hunter rounds should appear smooth and effortless to the spectator with the horse and rider working together to make the course flow from one jump to the next. Hunter courses typically consist of eight to 10 jumps that are more organic in form and generally lower in height than fences used in jumper classes.
**Jumpers**
Jumper classes are scored objectively based solely on the horse's athletic ability over fences as measured by time. A jumper's only job is to clear all the fences in the course as quickly as possible without incurring any faults. A horse incurs faults for each mistake made: four faults for each rail knocked down, four faults for every refusal, and 1 fault for every second over the maximum time allowed to negotiate the course. The horse with the least amount of faults and the fastest time wins. Jumper courses, which are technical in nature and typically consist of 12-16 jumps, require strategic riding in addition to a swift pace.
**Equitation**
Equitation classes are judged on the rider's ability, form, and skill to allow the horse to perform at its best, but the horse itself is not judged at all. The types of jumps and elements that make up an equitation course can resemble those used in either hunter or jumper classes, but the judging is subjectively based on the rider's position, style, proficiency, accuracy, use of the aids (hands, seat and legs), as well as an overall impression of complete and quiet control.
Source: https://www.ushja.org/about-us-and-news/hunterjumper-101

9.      In 2016, Rockette was leased to a third party who competitively showed the Horse from August of 2016 through May of 2017.   Upon information and belief, the 2016-2017 lease of the Horse from Defendants to that third party contained an exclusion of a specific medical condition of the right hind limb of the Horse (the "Preexisting Condition"), allowing cancellation of that lease and return of the Horse, should the Preexisting Condition cause the Horse to not be able to perform.   That same Preexisting Condition and exclusion were not disclosed to Plaintiffs, nor their veterinarians, during their subsequent business dealings with Defendants and subsequent lease of the Horse.

10.      Non-party Katie Williams is the daughter of Kristen Williams, who upon information and belief purchases horses or interests in horses, which Damico then registers with the USE, wherein Damico does business under the name "Ramble on Farm."

### The Relationship Between
### Plaintiffs and Defendants

11.      Plaintiffs have a minor 14 year old daughter, GS, who is an avid equestrian rider and who has ridden and competed actively since 2014 and competes in Wellington, Florida, amongst other places.

12.      Prior to GS moving to California in 2017 with her parents, Damico and ROF provided professional equestrian training to GS and her horses for over ten (10) years.

13.      During those ten years, GS, her parents and Damico developed a very close relationship, wherein the Sokolows reposed great trust and confidence in the specialized skill and experience of Damico and ROF in the equestrian industry.   As a result of this special relationship with Damico and ROF, Plaintiffs trusted Damico and ROF with the welfare and safety of their daughter GS in

the training of GS and GS' horses, and in Damico and ROF's recommendation and selection of horses for GS to lease and ride.

14.     From 2014 to 2017, relying upon that special relationship and specialized skills of Damico and ROF, Plaintiffs' leased four (4) horses or ponies owned by Defendants.

15.     When Plaintiffs moved to California in 2017, GS commenced working with another trainer, Elizabeth Reilly ("Reilly").  Damico and ROF nevertheless stayed in touch with the Sokolows and they occasionally saw each other at horse shows on the East Coast in 2018.

### The Lease of Rockette

16.     In the Fall of 2018, while Damico was in Saugerties, New York, Plaintiffs informed Damico and ROF they were looking to lease a new horse for GS to compete and informed Defendants that any such horse they obtained would be taken by GS and Plaintiffs to Wellington, Florida for the 2018-2019 Winter Equestrian Festival ("WEF") competitive horse show season and competed by GS from January through March 2019.

17.     Plaintiffs inquired whether Rockette was available for lease.   Plaintiffs were familiar with Rockette from their prior, close professional relationship with Defendants and had seen the Horse compete previously, though Plaintiffs were not familiar with the recent day-to-day condition and performance of the Horse since Plaintiffs had moved to California a year earlier.

18.     Damico and ROF responded that Rockette was available for lease and would be suitable for the intended use and plans of Plaintiffs and GS.

19.     In reliance upon that statement, and in further reliance upon the ten year-long relationship between Plaintiffs, GS and Damico and ROF, Plaintiffs took Damico and ROF at their word.

20.     Consequently, in September, 2018, Plaintiffs arranged to lease Rockette for $7,500.00 for a three week period during which time their daughter GS would compete the Horse at two horse shows in Maryland and Virginia.

21.     During the negotiations for the short-term lease and thereafter, Defendants did not disclose any preexisting medical conditions of the Horse.

22.     GS competed very successfully at the two horse shows in September and October 2018, earning the Championship ribbon at both horse shows.

23.     After the two horse shows where GS exhibited the Horse, again relying upon the representations of Damico and ROF as to the good condition and suitability of the Horse for GS, the Sokolows told Defendants that they wished to lease the Horse for a period of 13 months with the option to purchase the Horse outright at the end of that time period, with credit for the lease fee payments.

24.     Initially, on or about October 6, 2018, Cori Sokolow contacted Damico and offered to pay a total of $ 97,500.00 for a lease fee, for a lease of limited duration, payable in 13 monthly installments of $7,500.00 for the Horse.

25.     Damico declined this offer and pressured Cori Sokolow to make a more substantive offer, stating in a text message that the Horse was for sale:

> "I have three full price offers that want to try her [the Horse].   Two have wanted her since last year here but I said I wanted to let Katie show her in Florida for her last Junior Year and at Devon. I need to pursue other offers. Month to Month is too touch and go."

26.     Relying on that statement, the Sokolows offered to pay the $97,500.00 in two or three installments, to which Damico responded:

> *"I told you I would work with you but the small amount of payments just can't work for our situation- and it is too much risk if god forbid injury or anything. Katie needs a horse and Kristen needs a chunk of money to do so."*

27.    Damico later represented to Cori Sokolow that only a single-payment lease fee would be acceptable:

> *"The only way I can get this done financially is 100k upfront. Kristen needs that piece for another deal and I am willing to wait for that balance from you guys. Or I at least have to try with other interest before negotiating the payments."*

28.    At no time during these negotiations did Damico and ROF disclose to Plaintiffs that Rockette had any preexisting health issues with the right hind limb of the Horse, which Plaintiffs later came to learn was an osseous cyst defect ("OCD") in the distal lateral cannon bone of the right hind fetlock.

29.  For the convenience of the Court and the parties, the relevant body parts of the Horse are Illustrated in **Figures 1 and 2** below:

### Figure 1



### Figure 2



LONGITUDINAL SECTION OF FETLOCK & FOOT

30.     The individuals, Kristen and Katie, to whom Damico refers to in her text messages to Cori

Sokolow are, upon information and belief, Kristen and Kaitlyn Williams.   From those statements

made by Damico, it appears that Damico, either individually or under the name Ramble On Farm,

and Kristen Williams, each own an interest in Rockette and that Damico is acting as an agent of

that enterprise.

31.     Ultimately, and relying upon their special relationship with Damico and ROF, upon which

they had come to repose great trust and confidence in Damico and ROF and relying upon their

superior expertise in the equestrian industry, the Sokolows agreed to a lease-purchase arrangement

for Rockette (the "Lease Agreement"). A copy of the executed Lease Agreement is attached hereto as **Exhibit A**. The form of the Lease Agreement was provided by Damico and ROF.

32.     The Lease Agreement provided, in relevant part of ¶ 14 thereof, that:

> This Lease Agreement is terminated upon a breach of any material term and the other party has the right to collect all reasonable fees and costs from the breaching party.

33.     The structure of the Lease Agreement required a single payment of $100,000.00 upon execution of the lease and a payment of $50,000.00 on April 8, 2019.

34.     In order to justify paying that great amount of money for a Lease, and relying upon the representations of Damico as to the condition of the Horse, the Sokolows required that they be given a purchase option at the end of the Lease.

35.     Therefore, under ¶ 17 of the Lease Agreement, the Sokolows were given the option to purchase the Horse, with all lease fees credited to the purchase price, for an additional payment of $175,000.00 if the option was exercised on or before April 8, 2019, or for an additional payment of $200,000.00 if the option was exercised after April 8, 2019 and on or before October 8, 2019.

36.     Had the Sokolows been informed of the Preexisting Condition of the right hind limb of the Horse, the Sokolows would not have leased the Horse for the initial $ 100,000.00 lease fee, nor agreed to make any further lease payment, nor requested the purchase option with the credit of the $ 100,000.00 lease fee. Stated another way, the Sokolows would not have initially committed $100,000.00 toward a lease and purchase of the Horse had they been informed of the Preexisting Condition of the right hind limb of the Horse. That Preexisting Condition was not disclosed to them by Damico and ROF.

37.     Plaintiffs have come to learn that such Preexisting Condition of the Horse was so significant that the prior lessee of the Horse had insisted upon, and received, an exclusion of that condition from the obligations of the lessee under that lease.  This information was never disclosed to Plaintiffs or their veterinarians during their subsequent negotiations with Defendants, nor during their inspection of the Horse.

38.     Further, the Lease Agreement also required the Sokolows to insure the Horse for $350,000.00 and pay all expenses associated with its care and upkeep during the term of the lease. The annual premium for that insurance policy was $12,615.00.

39.     On October 9, 2018, in reliance upon Damico and ROF's representations that the Horse was in fine health and free from defects, Reilly arranged for a veterinary pre-purchase examination ("PPE") to be completed on the Horse by Dr. Kate Stephenson of Miller and Associates.   A copy of this veterinary report is attached hereto as **Exhibit B.**

40.     Reilly, on behalf of Plaintiffs, limited the scope of the PPE at this time because Damico and ROF assured Reilly and the veterinarian that the Horse was in very good health and did not have any preexisting health conditions which would affect the future soundness and performance of the Horse.

41.     Relying upon Damico and ROF's statement of the absence of any-preexisting medical conditions of the Horse, Dr. Stephenson did not to take any radiographs of the Horse's fetlocks or hocks in either the front or rear limbs of the Horse and relying upon those same acts and omissions of Damico, Dr. Stephenson did not consult Sokolows when making that decision.

42.     Further, during the pre-purchase exam, Damico did not, either as an owner of the Horse, or as an agent of the ownership enterprise, disclose any pre-existing health conditions in the medical history of the Horse to Dr. Stephenson.   See **Exhibit B, page 2.**

43.     Plaintiffs have since come to learn, in late January, 2019, that the undisclosed, Preexisting Condition pathology of the Horse was a remodeling of the right rear cannon and sesamoid bones of that limb with the presence of an OCD. In other words, the Horse had a condition that she was either born with or developed in that limb, which caused her pain and decreased her performance, and which, in the words of another veterinarian who has also examined the Horse, was a "ticking time bomb."   Further, the right hind pathology is the cause of current injury to the Horse in the right front pastern of the Horse.

44.     The Preexisting Condition of the Horse was not disclosed by Damico and ROF to Plaintiffs' veterinarian.   Therefore, when Plaintiffs insured the Horse, Plaintiffs were not aware that the health history of the Horse which they supplied to the insurance company through the disclosures in the veterinary certificate, was inaccurate.

45.     In sum, the misrepresentations and omissions by Damico and ROF had a cascading effect, not only misleading Plaintiffs and inducing them into executing the Lease Agreement with purchase option, but also misleading the veterinarian conducting the PPE and misleading the insurance company to insure the Horse at a value dictated by Damico and ROF, with the premium paid by Plaintiffs.

### The Condition of the Horse Deteriorates

46.     Upon executing the Lease Agreement and payment of the $ 100,000.00, GS showed Rockette at the Washington International Horse Show and then at the United States Hunter Jumper Association National Championship Horse Show, where the Horse was Reserve Champion.

47.     Thereafter, the Sokolows shipped the Horse to California, where it was ridden lightly and rested.

48.     On or about January 2, 2019, according to the Sokolows, the Horse was shipped to Wellington, Florida where she would compete with GS for the next three months.

49.     To attend and compete Rockette at WEF in Wellington, the Sokolows invested a great deal of money, including renting housing for themselves and GS, renting housing for their groom for the Horse, payment for the cross-country shipment of Rockette, payment for a stall for Rockette for eighteen (18) weeks in Wellington, travel expenses for GS, training and grooming fees, amongst other related expenses.

50.     Shortly after arriving in Wellington, Rockette became lame.   Upon examination by a veterinarian, Rockette was diagnosed as having suffered a micro fracture in the right front leg bone structure which required surgery.   When further examining the Horse in Wellington, the veterinarian discovered that there were severe abnormalities of the right hind cannon and sesamoid bones and the presence of the OCD that were causing the Horse to compensate by putting a great deal of pressure on her right front limb, causing further injury to the Horse.

51.     Subsequent to learning, in Wellington, Florida, from their veterinarian of the preexisting right hind limb condition, the Sokolows also have received information that, in 2016, when the Horse had been leased by Defendants to another rider, that lease contained an exclusion clause allowing that lessee to return the Horse to Defendants and obtain a refund of lease fee if the Horse were to become unsound as a result of the pathology in the right hind leg.

52.     Inconsistent with their prior knowledge of the preexisting pathology of the right hind limb of the Horse, Damico and ROF intentionally did not disclose the pathology of the Horse's right

hind leg and prevented the Plaintiffs from discovering that defect when Defendants negotiated and induced Plaintiffs to execute the Lease Agreement.

53.     As a result of the fracture to the right front leg and pathology of the right hind leg, the Plaintiffs veterinarians believe that the Horse will not be able to perform in the horse show ring for a very long time, if at all, and that the right hind leg pathology is the previously-described "ticking time-bomb" which will likely result in permanent lameness to the Horse, perhaps in a sudden event that could harm both Horse and rider at that time.

54.     Plaintiffs would never have committed $100,000.00 to lease the Horse with an option to purchase, if Defendants had properly disclosed the pathology in the Horse's right hind leg prior to the transaction.   Plaintiffs would never have entered into the Lease Agreement, nor expended all of the other costs associated with the Horse, nor sustained any of the expenses of diagnosing the Horse, had the preexisting pathology of the right hind limb of the Horse been disclosed to Plaintiffs by Defendants.

55.     Because the preexisting condition of the Horse ultimately prevented the Sokolows from using the Horse as intended in Wellington, Florida, the Sokolows paid for the transportation of the Horse from Wellington, Florida to Defendants in Ocala, Florida.   Plaintiffs also informed Defendants that they rescinded and cancelled the Lease Agreement and demanded repayment of the $100,000.00 lease fee.

56.     Defendants have responded to neither the rescission, nor cancellation nor to the demand for repayment.   Because the Lease Agreement was procured by fraud, it is void *ab initio.*

57.     Plaintiffs have retained the services of the undersigned counsel and committed to compensate counsel with a reasonable fee for their services and to pay all costs in this matter.

58.     All conditions precedent to this action have either been performed, waived or excused.

### Count I

### Fraudulent Misrepresentation
### Pursuant to F.S. § 680.505(4)

59.     Plaintiffs reallege and set forth the allegations of ¶¶ 1 through 58 of the Complaint against all Defendants as if more fully set forth herein.

60.     As set forth more particularly herein above, Defendants made statements to Plaintiffs and to Plaintiffs' veterinarian, as well as ultimately to Plaintiffs' insurance carrier, that the Horse lacked any preexisting medical condition and was suitable for the intended purpose of the Plaintiffs.

61.     Defendants also purposefully and willfully omitted such information when asked about the past medical history of the Horse by Plaintiffs and again when asked about any preexisting medical conditions by Plaintiffs' veterinarian during the PPE.

62.     Defendants also failed to disclose that they knew of the Preexisting Condition and that such condition had been specifically disclosed in a prior lease of the Horse to another lessee a year earlier.

63.     Defendants knew that the Preexisting Condition was material to the decision of Plaintiffs to enter into the lease of the Horse.

64.     At the time Defendants made such statements and such omissions, they knew the same to be false.  The Defendants made such statements and such omissions with the intent to induce

Plaintiffs to lease the Horse with an option to purchase, in order that Defendants receive compensation for that transaction.

65.     Defendants enjoyed a unique position of trust and confidence with Plaintiffs because of their 10 year business relationship and Defendants' skill and knowledge in the equine industry, and therefore knew that Plaintiffs would rely upon Defendants' statements and omissions about the Horse.

66.     Plaintiffs justifiably relied upon Defendants' statements and omissions about the Horse in deciding to commit to a $100,000 initial lease fee with an option to purchase, and in incurring subsequent costs of transportation, housing, board and later to the diagnosis of the condition of the Horse in Wellington, Florida.

67.     But for the misrepresentations and omissions of Defendants, which continued even after first inquiry by Plaintiffs to Defendants, as to the absence of any preexisting medical conditions of the Horse, Plaintiffs would not have sustained damages, such as commitment to the $100,000 lease fee with an option to purchase, and by incurring the subsequent costs of insurance, transportation, housing, board and the costs of further veterinary diagnosis and treatment of the Horse in Wellington, Florida.

WHEREFORE Plaintiffs demand judgment against Defendants, awarding Plaintiff damages as permissible by law, including but not limited to the return of the $ 100,000 paid lease fee, all other actual and consequential damages, prejudgment interest and such other relief as the Court finds just and proper.

## Count II

### Negligent Material Misrepresentation
### Pursuant to F.S. § 680.505(4)

68.     Plaintiffs reallege and set forth the allegations of ¶¶ 1 through 58 of the Complaint against all Defendants as if more fully set forth herein.

69.     As set forth more particularly herein above, Defendants made statements to Plaintiffs and to Plaintiffs' veterinarian, as well as ultimately through Plaintiffs to Plaintiffs' insurance carrier, that the Horse lacked any preexisting medical condition and was suitable for the intended purpose of the Plaintiffs.

70.     Defendants knew or should have known about the Preexisting Condition of the Horse, yet, omitted such information when asked about the past medical history of the Horse by Plaintiffs and again when asked about any preexisting medical conditions by Plaintiffs' veterinarian during the PPE.

71.     Defendants also failed to disclose that they knew of the Preexisting Condition and that such condition had been specifically disclosed in a prior lease of the Horse to another lessee a year earlier.

72.     Defendants knew or should have known that the Preexisting Condition was material to the decision of Plaintiffs to enter into the lease of the Horse.

73.     At the time Defendants made such statements and such omissions, they should have known the same to be false.   The failure of Defendants to disclose the Preexisting Condition to Plaintiffs and their PPE veterinarian induced Plaintiffs to lease the Horse with an option to purchase, for which transaction Defendants received compensation.

74.     Defendants enjoyed a unique position of trust and confidence with Plaintiffs because of their 10 year business relationship and Defendants' skill and knowledge in the equine industry, and

therefore should have known that Plaintiffs would rely upon Defendants' statements and omissions about the Horse.

75.     Plaintiffs justifiably relied upon Defendants' statements and omissions about the Horse in deciding to commit to a $100,000 fee with an option to purchase, and in incurring subsequent costs of transportation, housing, board and later to the diagnosis of the condition of the Horse in Wellington, Florida.

76.     But for the misrepresentations and omissions of Defendants, which continued even after the first inquiry by Plaintiffs to Defendants, as to the absence of any preexisting medical conditions of the Horse, Plaintiffs would not have sustained damages, such as commitment to a $100,000 lease fee with an option to purchase, and by incurring the subsequent costs of insurance, transportation, housing, board and the costs of further veterinary diagnosis and treatment of the Horse in Wellington, Florida.

WHEREFORE Plaintiffs demand judgment against Defendants, awarding Plaintiff damages as permissible by law, including but not limited to the return of the $ 100,000 paid lease fee, all other actual and consequential damages, prejudgment interest and such other relief as the Court finds just and proper.

### Count III

### Unjust Enrichment
### and Disgorgement

77.     Plaintiffs reallege and set forth the allegations of ¶¶ 1 through 58 of the Complaint against all Defendants as if more fully set forth herein.

78.     Defendants accepted the $ 100,000 lease fee while delivering non-conforming goods with a latent defect, namely the Horse with the Preexisting Condition.

79.     Defendants represented to Plaintiffs that the Horse was healthy and sound, and that the Horse would be so, in exchange for payment of the lease fee and later the purchase price, if the purchase option was exercised.

80.     Plaintiffs relied upon those representations in making the lease fee payment to Defendants, with full knowledge of Defendants.

81.     Plaintiffs have returned the Horse to Defendants, but Defendants have failed and refused to provide a refund to Plaintiffs of the lease fee.

82.     Defendants now have received and enjoy possession of the $ 100,000.00 lease fee funds while Plaintiff has sustained loss of the lease fee, and actual damages, including but not limited to insurance, costs of transportation, housing, board and the costs of further veterinary diagnosis and treatment of the Horse in Wellington, Florida.

83.     Under such circumstances it is inequitable for Defendants to retain the lease fee monies while providing non-conforming goods.

        WHEREFORE Plaintiffs demand judgment against Defendants requiring Defendants to disgorge the lease fee money and pay Plaintiff damages as permissible by law, for prejudgment interest and such other relief as the Court finds just and proper.

## Count IV

### Strict Liability for Unfair and Deceptive Trade Practice
### Pursuant to F.S. Chapter 501, Part II
### and Demand for Injunction

84.     Plaintiffs reallege and set forth the allegations of ¶¶ 1 through 58 of the Complaint against all Defendants as if more fully set forth herein.

85.     As set forth herein above, Plaintiffs contracted with Defendants for a lease of the Horse with an option to purchase the Horse exercisable during the time frame when the Horse was in Florida.

86.     Florida Administrative Code 5H-26.003(12) *General Requirements Relating to the Sale or Purchase of Horses,* provides, in relevant part, that:

> (12) When an Owner or its agent provides **any medical information in response to an inquiry from a Purchaser or its agent about the medical history of a horse,** the Owner or its agent **shall accurately disclose all information** within its knowledge that is responsive to the inquiry. [emphasis added].

87.     Therefore, in addition to their common-law obligation to disclose to Plaintiffs the Preexisting Condition, Defendants were also obligated by F.A.C. 5H-26.003(12) to disclose the Preexisting Condition to Plaintiffs and to Plaintiffs' veterinarian conducting the PPE.

88.     As also previously set forth herein, the failure of Defendants to disclose the Preexisting Condition caused Plaintiffs actual damages, including but not limited to: commitment to and payment of a $100,000 lease fee with an option to purchase, and by incurring the subsequent costs of insurance, transportation, housing, board and the costs of further veterinary diagnosis and treatment of the Horse in Wellington, Florida.

89.     Florida Administrative Code 5H-26.003 *General Requirements Relating to the Sale or Purchase of Horses,* further provides in relevant part that:

(13) A violation of any provision of Chapter 5H-26, F.A.C., resulting in actual damages to a person, shall be considered **an unfair and deceptive trade practice pursuant to Chapter 501, Part II, F.S.** [emphasis added]

90.     Defendants did not disclose the Preexisting Condition of the Horse when asked about the medical history of the Horse.   This failure to disclose the Preexisting Condition, whether purposeful or inadvertent, resulted in actual damages to Plaintiff.   Therefore, Defendants are strictly liable under the Florida Unfair and Deceptive Trade Practices Act, F.S. §501.201 *et seq.* for commission of unfair and deceptive trade practice.

WHEREFORE, pursuant to F.S. § 501.2075 and § 501.207, Plaintiff demands judgment and injunction against Defendants:

  a. Reimbursing Plaintiffs all actual and consequential damages, including but not limited to the $ 100,000.00 lease fee, the costs of insurance, transportation, diagnosis, treatment, care and maintenance of the Horse;

  b. Preventing Defendants from engaging in the purchase or sale of horses within the jurisdiction of this Court;

  f. Requiring Defendants to pay to Plaintiffs' the Plaintiffs' reasonable attorneys' fees and costs of suit; and

  g. Awarding such other legal, equitable or appropriate relief as the Court finds proper.

## Count V

### Breach of Fiduciary Duties

91.     Plaintiffs reallege and set forth the allegations of ¶¶ 1 through 58 of the Complaint against all Defendants as if more fully set forth herein.

92.     As set forth herein above, Defendants enjoyed a special relationship of trust and confidence which existed at the time Plaintiffs contacted Defendants with respect to the Horse for Plaintiffs to lease and purchase.

93.     Plaintiffs relied upon that relationship and also upon the superior skill, experience and knowledge in the equine industry of Defendants and the truthfulness and veracity of Defendants in placing their trust and confidence in Defendants when Defendants recommended the Horse for lease and purchase by Plaintiffs.

94.     By virtue of that skill, experience and knowledge in the equine industry, Defendants had cultivated and obtained a position of trust with Plaintiffs over a ten year period of time.

95.     Further, by virtue of that special relationship with Defendants concerning the lease and purchase of the Horse, Defendants owed Plaintiffs the duties of being truthful and of putting Plaintiffs' interests before their own interests and to not engage and avoid any misrepresentation, omission of material facts or self-dealing.

96.     Defendants breached those fiduciary duties by:

        a.      Misrepresenting the medical condition of the Horse;

        b.      Failing to disclose the Preexisting Condition of the Horse during the negotiations
        for and execution of the Lease Agreement;

     c.      Obtaining compensation from the lease transaction from Plaintiff while making the aforesaid misrepresentation and omission;

     d.      Failing to disclose the Preexisting Condition during the PPE of the Horse; and

     e.      Failing to disclose the Preexisting Condition of the Horse to Plaintiffs after the execution of the Lease Agreement.

97.     Defendants took the foregoing acts and made the foregoing omissions and misrepresentations when Defendants were in that special relationship with Plaintiffs.

98.     But for the foregoing acts and the foregoing omissions and misrepresentations by Defendants, Plaintiffs would not have taken the aforesaid actions of commitment to and payment of a $100,000 lease fee with an option to purchase, and by incurring the subsequent costs of insurance, transportation, housing, board and the costs of further veterinary diagnosis and treatment of the Horse in Wellington, Florida.

99.     As a result of the foregoing acts and the foregoing omissions and misrepresentations by Defendants, Plaintiffs have sustained damages including but not limited to commitment to and payment of a $100,000 lease fee with an option to purchase, and the subsequent costs of insurance, transportation, housing, board and the costs of further veterinary diagnosis and treatment of the Horse in Wellington, Florida.

WHEREFORE Plaintiffs demand judgment against Defendants, awarding Plaintiff damages as permissible by law, including but not limited to the return of the $ 100,000.00 lease fee, all other actual and consequential damages, prejudgment interest and such other relief as the Court finds just and proper.

## Count VI

### Breach of Contract

100.     Plaintiffs reallege against all Defendants and set forth the allegations of ¶¶ 1 through 58 of the Complaint as if more fully set forth herein.

101.     Plaintiffs and Defendants entered into a valid lease and purchase option contract that required Defendants to provide Plaintiff with a Horse that was free of undisclosed defects.

102.     Plaintiffs performed all acts required of them under the contract, including tendering the first payment $ 100,000.00 lease monies to Defendants.

103.     Defendants failed to perform Defendants' requisite act under the contract by failing to deliver a Horse that was free from undisclosed defect of the Preexisting Condition at the time of delivery.

104.     Upon discovery of the undisclosed Preexisting Condition, Plaintiffs rescinded and cancelled the contract for the lease and purchase of the Horse pursuant to F.S. §§ 680.505 and 672.721.

105.     Plaintiffs have sustained damages including but not limited to commitment to and payment of a $100,000 lease fee with an option to purchase, and by incurring the subsequent costs of insurance, transportation, housing, board and the costs of further veterinary diagnosis and treatment of the Horse in Wellington, Florida.

WHEREFORE Plaintiff demands judgment against Defendants awarding Plaintiffs damages as permissible by law, including but not limited to the return of the $ 100,000.00 lease payment, prejudgment interest and such other relief as the Court finds just and proper.

## Count VII

### Breach of Express Warranties, F.S. § 680.21

106.         Plaintiffs reallege against all Defendants and sets forth the allegations of ¶¶ 1

through 58 of the Complaint as if more fully set forth herein.

107.         Both prior to and subsequent to delivery of the Horse to Plaintiffs, Defendants

made to Plaintiffs numerous express statements of warranty that the Horse was sound, free of

defect and capable of successful performance consistent with its past abilities and established

show record.

108.         Further, after delivery of the Horse, but before the discovery by Plaintiffs of the

undisclosed Preexisting Condition, Defendants made further statements of warranty that the

Horse was sound and free of defect, when in fact it was not.

109.         The express warranty given by Defendants to Plaintiffs before the Horse was

delivered that the Horse conformed to the description when leased became the basis for the

bargain between Plaintiffs and Defendants.

110.         There were no disclaimers of such warranty by Defendants.

111.         Plaintiffs sought to seasonably identify and cure the defect of the undisclosed

Preexisting Condition in the Horse, when in fact such defect could not be cured.

112.         As a result of the breach of such express warranty by Defendants, Plaintiffs have

sustained damages for which Defendants are liable, including but not limited to commitment to

and payment of a $100,000 lease fee with an option to purchase, and by incurring the

subsequent costs of insurance, transportation, housing, board and the costs of further

veterinary diagnosis and treatment of the Horse in Wellington, Florida.

WHEREFORE Plaintiffs demand judgment against Defendants, awarding Plaintiff damages as permissible by law, including but not limited to the return of the $ 100,000 lease fee, all other actual and consequential damages, prejudgment interest and such other relief as the Court finds just and proper.

## Count VIII

### Breach of Implied Warranty of Fitness For Particular Purpose, F.S. § 680.213

113.　　　　Plaintiffs reallege against all Defendants and sets forth the allegations of ¶¶ 1 through 58 of the Complaint as if more fully set forth herein.

114.　　　　At the time of the contract between Defendants as Lessor and Plaintiffs as Lessee, Defendants had reason to know that the Horse was being leased for the particular purpose of successful competition is the classifications in which she had previously established an equine show record and that Plaintiffs were relying upon that utility for that particular purpose in leasing the Horse and committing to pay all of the expenses surrounding the use of the Horse in Florida for that particular purpose.

115.　　　　At the time of the contract between Plaintiffs and Defendants, Defendants knew that Plaintiff was relying upon Defendants' skill or judgment as Lessor of the Horse to select or furnish suitable goods, fit for the particular purpose for which the Horse was leased.

116.　　　　There were no disclaimers of such warranty by Defendants.

117.　　　　By delivering the Horse with the undisclosed defect of the Preexisting Condition, which consequently caused lameness in the Horse in Florida, Defendants breached the Implied Warranty of Fitness for a Particular Purpose.

118.         As a result of the breach of such express warranty by Defendants, Plaintiffs have

sustained damages for which Defendants are liable, including but not limited to commitment to

and payment of a $100,000 lease fee with an option to purchase, and by incurring the

subsequent costs of insurance, transportation, housing, board and the costs of further

veterinary diagnosis and treatment of the Horse in Wellington, Florida.

WHEREFORE Plaintiffs demand judgment against Defendants, awarding Plaintiff

damages as permissible by law, including but not limited to the return of the $ 100,000.00 lease

fee, all other actual and consequential damages, prejudgment interest and such other relief as the

Court finds just and proper.

### .Count IX

### Breach of Implied Warranty of Merchantability, F.S. § 680.212

119.         Plaintiffs reallege against all Defendants and sets forth the allegations of ¶¶ 1

through 58 of the Complaint as if more fully set forth herein.

120.         Defendants are merchants in that they have been in the past and /or at all relevant

times hereto, lessors and sellers of Horses in Florida as some or all of their business and trade.

121.         The Agreement between the parties contained implied warranties that the Horse, as

delivered:

a.         Would pass without objection in the trade as a Horse worth the $

100,000.00 lease price and the $ 350,000.00 purchase price, and able to perform as it has

according to its prior show record during the lease period and if purchased; and

b.         Was fit for performance in the equine show classifications for which such a

Horse was ridden;

     c.     Conformed to the promises or affirmations by Defendants that the Horse was sound and capable of performance consistent with its past abilities and record; and

     d.     Did not contain undisclosed health defects so as to render the Horse non-conforming as to the parties' contract; and

     e.     Did not contain certain undisclosed defects so as to render the Horse non-conforming as determined by the course of dealing of the parties and/or the usage and trade in the equine industry.

122.     There were no disclaimers of such warranties by Defendants.

123.     By delivering Rockette to Plaintiff with the undisclosed defect in the right hind leg, which consequently caused lameness in the horse, Defendants breached the Implied Warranties of Merchantability in that the Horse as delivered:

     a.     Would not pass without objection in the trade as a Horse worth the $100,000.00 lease price and able to perform as it has previously; and

     b.     Was not fit for performance in the equine show classifications for which such a Horse was ridden;

     c.     Did not conform to the promises or affirmations by Defendants that the Horse was sound and capable of performance consistent with its past abilities and record;

     d.     Contained certain undisclosed defects so as to render the Horse non-conforming as to the parties' contract; and

     e.     Contained certain undisclosed defects so as to render the Horse non-conforming as determined by the course of dealing of the parties and/or the usage and trade in the equine industry.

As a result of the breach of such implied warranties by Defendants, Plaintiffs have sustained damages for which Defendants are liable, including but not limited to: (a) loss of the purchase price; and (b) incidental, consequential damages, expenses, charges and commissions.

WHEREFORE Plaintiffs demand judgment against Defendants awarding Plaintiffs damages as permissible by law, including but not limited to the return of the $ 100,000.00 lease payment, prejudgment interest and such other relief as the Court finds just and proper.

## Count X

## Rescission and Cancellation

124.   Plaintiffs reallege against all Defendants and sets forth the allegations of ¶¶ 1 through 58 of the Complaint as if more fully set forth herein.

125.   As set forth herein, the Plaintiffs agreed with Defendants to lease the Horse with an option to purchase 100% of the ownership interest in the Horse from Defendants later in Florida.

126.   Plaintiffs paid the $ 100,000.00 lease fee to Defendants.   However, Defendants did not then or thereafter disclose the Preexisting Condition to Plaintiffs.

127.   Plaintiffs discovered the Preexisting Condition in Florida only after having performed under the lease and having incurred actual damages in Florida.

128.   After discovering the Preexisting Condition, while in Florida, Plaintiffs informed Defendants that Plaintiffs desired to return the Horse from Wellington, Florida.   Defendants agreed to accept return of the Horse but have not thereafter refunded Plaintiffs the $100,000.00 lease fee.

129.     As set forth herein above, the Lease Agreement with option to purchase was procured by Defendants through fraudulent misrepresentations and omissions.

130.     Plaintiffs have notified Defendants prior to this lawsuit that Plaintiffs are rescinding and cancelling the Lease Agreement because of the aforesaid fraud and deception by Defendants.

131.     Because the Lease Agreement was procured by fraud, it is void *ab initio* and therefore Plaintiff has no adequate remedy at law.

132.     As a result of the fraud by Defendants, which vitiates all parts of the Lease Agreement, Plaintiffs have sustained damages for which Defendants are liable, including but not limited to commitment to and payment of a $100,000 lease fee with an option to purchase, and by incurring the subsequent costs of insurance, transportation, housing, board and the costs of further veterinary diagnosis and treatment of the Horse in Wellington, Florida.

WHEREFORE Plaintiffs demand judgment against Defendants, awarding Plaintiffs damages as permissible by law, including but not limited to the return of the $100,000.00 lease fee and all other actual and consequential damages, prejudgment interest and such other relief as the Court finds just and proper.

## Jury Demand

Plaintiffs hereby request trial by jury on all matters so triable as of right.

Respectfully submitted,

CHAPMAN LAW GROUP, PLC,

*Avery S. Chapman*
Avery S. Chapman, Esq.
FL Bar No. 517321
12008 South Shore Blvd.
Suite 105

Wellington, Florida 33414
Tel. 561.753.5996
Facsimile 561.828.2852
asc@chapmanlawgroup.net
teh@chapmanlawgroup.net